### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURA A. YINGST | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | NO. 18-4558 |
| v. | : | |
| | : | |
| COATESVILLE HOSPITAL | : | |
| COMPANY, LLC d/b/a | : | |
| BRANDYWINE HOSPITAL | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                        SEPTEMBER 18, 2020

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff Laura Yingst filed a civil action complaint against Defendant Coatesville Hospital Company, LLC d/b/a Brandywine Hospital ("Defendant" or "Brandywine"), in which she asserts claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* [ECF 1]. Before this Court are Defendant's motion for summary judgment, [ECF 30], Plaintiff's response in opposition, [ECF 33], and Defendant's reply, [ECF 36]. The issues presented in the motion are fully briefed and ripe for disposition. Because Defendant has articulated legitimate, nondiscriminatory reasons for failing to hire Plaintiff, and Plaintiff has not identified sufficient evidence in the record to support a conclusion that Defendant's reasons were pretextual, Defendant's motion for summary judgement is granted.

### BACKGROUND

In her complaint, Plaintiff asserts claims for discrimination and retaliation under the ADA and the PHRA. Defendant moves for summary judgment on all claims. In deciding a motion for

summary judgment, this Court must consider all relevant, supported facts in the light most favorable to the non-movant; here, Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  The relevant facts are summarized as follows:[1]

> Plaintiff began working at Brandywine as a nurse in 1987.  Nurses at Brandywine are employed on a per diem, part-time, or full-time basis.  Per diem nurses fill in for part-time and full-time nurses and do not have guaranteed hours or set schedules.  After several years as a full-time nurse, and a brief period working for another hospital, in 1997, Plaintiff began working as a per diem nurse at Brandywine until her resignation in November 2016; specifically, from 1997 through 2010, she worked in Brandywine's intensive care unit ("ICU") and, thereafter, she transferred to the Post-Anesthesia Care Unit ("PACU").

> Between 2007 and 2011, Plaintiff suffered from migraine headaches which periodically caused her to miss work.  Since per diem nurses do not have set schedules, they do not request time off in the typical sense, but rather indicate to schedulers that they are unavailable.  Nevertheless, during this time period, Plaintiff received multiple verbal and written warnings pertaining to, *inter alia*, excessive absences.  Notably, all of Plaintiff's discipline for excessive absences predates the arrival of Plaintiff's most recent supervisor, Justine Murphy, at Brandywine.

> Beginning in 2011, Murphy served as Brandywine's Director of Perioperative Services and supervised approximately fifty to sixty employees in several departments.  Among Murphy's many responsibilities was making final hiring decisions for all nurses in the PACU.  In Plaintiff's yearly evaluations, Murphy, as Plaintiff's supervisor, rated Plaintiff highly and repeatedly described her as a "good teammate."

> In July 2014, Plaintiff learned that she had breast cancer.  Plaintiff's cancer treatment regimen, as well as subsequent reconstructive surgery and complications that followed, caused Plaintiff to be unavailable for work on several occasions during 2014 and 2015.  Her unavailability often lasted 2-3 weeks, but, at one point, lasted nearly two months.[2]  Plaintiff was not warned or disciplined regarding the time she missed relating to her cancer treatment and recovery.  Plaintiff testified

---

[1]     The facts are taken from the parties' respective briefs, proffered statements of undisputed facts, and cited supporting materials in the record.  To the extent that any facts are disputed, such disputes are noted and, if material, construed in Plaintiff's favor.  Facts asserted by a party and supported by the record, which are uncontested by the other party, whether directly or by implication, are taken to be true.  *See* Fed. R. Civ. P. 56(e).

[2]     At her deposition, Plaintiff testified that December 2015 is the last time that she texted Murphy regarding her medical treatment and/or time off related to cancer and post-cancer procedures.

that, throughout her battle with cancer and related complications, Murphy and the PACU nurses were supportive, sending her text messages, cards, and flowers.

On January 24, 2016, Plaintiff sent Murphy a text message inquiring whether a part-time position had been posted to replace a nurse who was out on disability (hereinafter "Position 1"). Plaintiff indicated that she hoped to interview for Position 1, reminding Murphy that she had previously indicated an interest in part-time or full-time positions. Murphy replied that it had not been posted, but added, "let's talk." Plaintiff next texted Murphy on February 29, 2016 to let her know that she had listed Murphy as a reference for an employment opportunity in Florida. On March 8, 2016, Plaintiff texted Murphy to let her know that she had listed Murphy as a reference for another position in Florida. Later that month, Plaintiff again inquired about Position 1 and Murphy replied that the position had still not been posted, but would be designated as part-time once posted. After that exchange, Plaintiff did not text Murphy again regarding possible open positions at Brandywine.

At least two nurses departed permanent positions in the PACU in the spring of 2016, leaving the unit understaffed. In pursuit of permission to hire additional staff, on May 3, 2016, Murphy prepared a memorandum for hospital administrators, wherein she observed that only four PACU nurses remained, among them Plaintiff, who "has had 4 surgeries over the past year and been out a good amount of time." Ultimately, three positions were approved for hiring in May and June of that year, *to wit*: (1) Position 1, a part-time position, posted on May 20, 2016; (2) a part-time position posted on June 7 ("Position 2"); and (3) a full-time position posted on June 8 ("Position 3").

On May 31, 2016, Plaintiff submitted an application for Position 1, mistakenly believing that her application would be considered for any jobs that might become available in the PACU. By the time Plaintiff applied for Position 1, Murphy had already interviewed an external candidate, Denise Childs, who had walked in to inquire about possible employment on May 27, 2016. Childs met with Human Resources ("HR") Manager Dina Criniti, submitted an online application, and interviewed with Murphy that same day. Murphy testified that Childs was "the package" with extensive nursing experience, and that the decision to hire Childs was made more or less on the spot. While the only documentation of Childs's offer is an HR system entry on June 20, when the position was marked as filled, both Murphy and Criniti testified that the decision to hire Childs was made on May 27, and that the delay in officially recording the hire was the result of the "pre-employment process," which according to Criniti typically takes "about a month."

Though Plaintiff technically applied only for Position 1, she was interviewed for Position 2 on July 14, 2016, along with another internal candidate, Jeanne Maerz, who had also applied for Position 1 after May 27. Criniti testified that Brandywine could consider these internal candidates for Position 2, since it was for the same number of work hours as Position 1. Prior to the interview, as is

3

standard procedure for internal candidates, Plaintiff's employee file was reviewed by Brandywine HR.  Plaintiff's personnel records included the warnings Plaintiff received prior to 2011, but contained no records of any absences (including those related to Plaintiff's cancer treatment) during Murphy's tenure.  In a June 20, 2016 email to Murphy and Criniti, HR Director Kelly Besack listed Plaintiff's pre-2011 disciplinary history and offered to help "sift through" "Laura's call outs," and indicated that "the absence issues with Laura are chronic."

Murphy texted Plaintiff the night before the Position 2 interview to let Plaintiff know that the interview would occur the following day. By all accounts, Plaintiff's interview did not go well; multiple witnesses reported that Plaintiff, who took offense to a question about what she would bring to the PACU team, came across as unprofessional.  Plaintiff conceded that she was "agitated" and insulted by the premise of the question. Murphy testified that the interview was "pretty unsettling for everybody."  Maerz, who was interviewed the same day as Plaintiff, was given no advance notice of her interview and could not recall whether she was asked the same question that had offended Plaintiff.  Murphy testified that after the interviews, "everyone's decision was Jeanne [Maerz]."  Murphy added that Plaintiff's interview performance and, to some extent, staff member comments about having difficult relationships with Plaintiff, motivated her decision to hire Maerz.

By the time Position 3—the full-time position—was posted full-time ICU nurse Michael Sheridan had begun picking up shifts in the PACU.  Sheridan testified that he was "proactively looking for a job and sought out the hiring manager [(Murphy)] and tried to get an audience with her as much as [he] could." When Position 3 was posted, Murphy suggested that Sheridan fill out an application.  Sheridan attempted to submit an online application, but had technical issues, so he followed up repeatedly with Murphy, expressing concern that his application had not been properly received.  Eventually, Criniti submitted Sheridan's application for him, which she testified is typical when candidates have technical problems, "which happens often."

Plaintiff did not submit an application for Position 3.  However, she testified that she saw Sheridan's name on the PACU schedule for full-time work in late June 2016 and confronted Murphy about it.  Plaintiff asked Murphy why Sheridan was hired and Murphy responded, "because you missed too much time."  Plaintiff asked Murphy whether Murphy was referring to Plaintiff's time missed because of her breast cancer and reconstructive surgery, but Murphy did not respond.  Feeling that she was being treated unfairly, Plaintiff met with Criniti in the HR office a couple of days later.  According to Plaintiff, she told Criniti that Murphy's comment made her feel that she had been discriminated against in the hiring process based on her breast cancer.  Criniti assured Plaintiff that she "had rights" and promised to pass the message along to HR Director Besack, who reportedly reached out to Plaintiff to set a time to meet. Plaintiff testified that she replied to Besack with her availability, but Besack never followed up to schedule a meeting.

4

Later that Fall, when it "became clear" to Plaintiff that "they weren't going to take [her] at Brandywine for a full-time or part-time position," she resumed her job search in Florida, ultimately obtaining a job offer as a travel nurse. During the job search process, Plaintiff listed Murphy as a reference multiple times and Murphy generally reviewed Plaintiff in positive terms. Once Plaintiff obtained the Florida position, she resigned from Brandywine on November 21, 2016. Plaintiff left her resignation letter in Murphy's mailbox at the hospital, in which she expressed feeling that she was treated unfairly, and texted Murphy that she had dropped off the letter. Murphy received the text, but denies ever receiving the letter. Prior to resigning, Plaintiff filed a Charge of Discrimination with the EEOC, laying the foundation for this lawsuit.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56 governs summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, a court must view the evidence in the light most favorable to the nonmoving party. *Galena*, 638 F.3d at 196.

Pursuant to Rule 56, the movant bears the initial burden of informing a court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322. After the movant has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a

genuine issue of material fact or by "showing that the materials cited do not establish the absence

or presence of a genuine dispute."  Fed. R. Civ. P 56(c)(1)(A)-(B).  The nonmoving party must

"do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving

party may not rely on "bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co.*

*of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the

pleadings. *Celotex*, 477 U.S. at 324.  Rather, the nonmoving party must "go beyond the pleadings"

and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (citations

omitted).

**DISCUSSION**

In her complaint, Plaintiff asserts that when Defendant failed to hire her for Positions 1, 2,

and 3 (collectively, the "Positions"), it discriminated against her because of her breast cancer

and/or retaliated against her for complaining about unfair treatment in the hiring process.[3]

Both Plaintiff's discrimination and retaliation claims are examined under the analytical

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Proudfoot*

*v. Arnold Logistics, LLC*, 629 F. App'x 303, 306 (3d Cir. 2015).  As a panel of the United States

Court of Appeals for the Third Circuit (the "Third Circuit") recently explained:

> This framework proceeds in three steps.  First an employee must establish a *prima*
> *facie* case of [each of her claims].  Second, once an employee has made a *prima*
> *facie* case, the burden shifts to the employer to articulate some legitimate,

---

[3]      The foregoing analysis focuses on Plaintiff's ADA claims but applies with equal force to her PHRA
claims, since the ADA and PHRA "serve the same goals" and may be interpreted "coextensively."
*Scarborough v. Cent. Bucks Sch. Dist.*, 632 F. App'x 80, 82 (3d Cir. 2015) (quotations omitted); *see also*
*Buskirk v. Apollo Metals*, 307 F.3d 160, 166 n.1 (3d Cir. 2002) (observing "[t]he PHRA and the ADA are
basically the same . . . in relevant respects[,] and Pennsylvania courts . . . generally interpret the PHRA in
accord with its federal counterparts.") (internal quotations and citations omitted).

nondiscriminatory reason for the employee's rejection. Third, once an employer proffers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination.

*Mascarenhas v. Rutgers*, 814 F. App'x 698, 700 (3d Cir. 2020) (internal quotations and alterations omitted).

Defendant contends that Plaintiff cannot make out a *prima facie* case of discrimination or retaliation with respect to any of the Positions available and, further, that it had legitimate, nondiscriminatory reasons for choosing the applicants who were hired. In her response, Plaintiff argues that she can establish a *prima facie* case for each of her claims, and that the record contains sufficient evidence to support a reasonable inference that Defendant's articulated, purportedly nondiscriminatory reasons for rejecting Plaintiff were pretextual. This Court will examine each claim in turn.

### *Discrimination*

"To establish a *prima facie* case for relief in an employment-discrimination case alleging a failure to hire, an applicant must establish that: (1) he belongs to the protected category; (2) he applied for and was qualified for a position for which the covered employer was seeking applicants; (3) despite his qualifications, he was not hired; and (4) after his rejection, the position remained open, or was filled in a manner giving rise to an inference of discrimination." *Alja-Iz v. U.S.V.I. Dep't of Educ.*, 626 F. App'x 44, 46 (3d Cir. 2015) (citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996)). In disability discrimination cases, courts have held that Plaintiffs may satisfy the fourth prong simply by showing that a non-disabled person was hired. *See, e.g., Roberts v. Mercy Catholic Med. Ctr.*, 2019 WL 1773379, at *4 (E.D. Pa. Apr. 23, 2019). Here, Defendant does not dispute either that Plaintiff's history of breast cancer is a disability that

satisfies the first requirement, or that Plaintiff was "qualified" for the Positions, satisfying the second requirement.   The record shows Plaintiff was not hired, in satisfaction of the third requirement.

Additionally, nothing in the record suggests that the applicants that were hired were disabled or regarded as such.   Thus, under the aforementioned standard articulated by some courts in this Circuit, Plaintiff can establish a *prima facie* case of discrimination.   However, conclusive resolution of whether Plaintiff has established a *prima facie* case is not necessary, because Defendant articulated legitimate, nondiscriminatory reasons for its hiring decisions, and Plaintiff has not identified evidence sufficient to establish that those reasons are pretextual.   This Court will examine each position in turn.

*Position 1*

Position 1, a part-time position in the PACU, was posted on May 20, 2016 and  Plaintiff applied for it on May 31, 2016.  Defendant contends that prior to Plaintiff's application, an external candidate (Childs) had already applied, been interviewed, and been hired for the position.  Murphy testified that Nurse Childs was "the package," with "ICU experience . . . peds experience . . . critical care experience[,] PACU experience[, a]nd . . . very good people skills," (Murphy Dep. at 147:1-147:5), and both Murphy and Criniti testified that the decision to hire Childs was made on May 27, 2016—several days before Plaintiff had even applied for Position 1.  (Murphy Dep. at 146:5-18, 160:2-24; Criniti Dep. at 107:5-6, 110:18:24, 117:17-21, 119:22-120:14).   Defendant contends that Childs was highly qualified and that the bases for offering her the position prior to receiving Plaintiff's application constitute legitimate, nondiscriminatory reasons for hiring Childs over Plaintiff.  Thus, Defendant has satisfied its burden, at stage two of the *McDonnell Douglas* analysis, to "articulate[] any legitimate reason for the adverse employment action." *Gardner v.*

8

*Sch. Dis. of Phila.*, 636 F. App'x 79, 86 (3d Cir. 2015) (quoting *Krouse v. Am. Sterilizer Co.*, 126

F.3d 494, 500 (3d Cir. 1997)).  In response, Plaintiff attempts to cast doubt on the precise timing

of the decision to hire Childs, noting that Position 1 was not officially filled until June 20, 2016.

Plaintiff's arguments, however, are unpersuasive.

      As noted, "[w]hen the employer meets [its] burden, the burden shifts back to the employee,

who then must 'prove by a preponderance of the evidence that the legitimate reasons offered by

the employer were not its true reasons, but were a pretext for discrimination.'"  *Gardner*, 636 F.

App'x at 86 (quoting *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (alterations omitted)).

At this stage of the *McDonnell Douglas* analysis, "an employee may defeat a motion for summary

judgment 'by pointing to some evidence, direct or circumstantial, from which a factfinder would

reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

an invidious discriminatory reason was more likely than not . . . a determinative cause of the

employer's action.'"  *Gardner*, 636 F. App'x at 86 (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.

3d 403, 413 (3d Cir. 1999)).  To meet her "difficult burden" with respect to Position 1, in an

attempt to cast doubt on Defendant's claim that Nurse Childs was offered the job before Plaintiff

applied, Plaintiff merely notes that the position was not officially marked as filled until June 20,

2016.  *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 354 (E.D. Pa. 2013).  However,

both Murphy and Criniti consistently and repeatedly testified that an offer was made to Childs on

May 27th, and that post-offer, pre-employment screenings, which typically take "about a month,"

had to be conducted prior to officially marking the position as filled.  (Murphy Dep. at 162:11-21;

Criniti Dep. at 106:11-22, 115:14:23).  Moreover, the record reflects that after receiving Plaintiff's

application for Position 1, which had already been offered to Childs, Murphy interviewed Plaintiff

for Position 2, another part-time position in the PACU, though Plaintiff had not applied for that

opening.  (Murphy Dep. at 172:23-174:3; Criniti Dep. at 119:11-121:24).  This evidence could not

lead a reasonable factfinder to disbelieve Defendant's explanation for hiring Childs, much less find

that discrimination was "more likely than not a . . . determinative cause" of Defendant's failure to

hire Plaintiff for Position 1.  *Jones*, 198 F. 3d at 413.  As such, Plaintiff's discrimination claim

fails with respect to Position 1.

*Position 2*

Between May 27th, when Position 1 was offered to Nurse Childs, and June 20th, when

Position 1 was officially filled, both Plaintiff and another internal candidate, Nurse Maerz,

submitted applications for Position 1.  As noted, though Position 1 had already been offered to

Childs, Position 2, also a part-time position in the PACU, was posted on June 7, 2016.  Believing

that "if you're interested in one part-time job, then obviously you're interested in the next one,"

Murphy interviewed both Plaintiff and Maerz for Position 2.[4]  (Murphy Dep. at 172:23-174:3).

Both candidates were interviewed on July 14, 2016, each on rather short notice (Murphy notified

Plaintiff via text message the night before and Maerz "one minute before" she was brought into

the room).  (*See* Yingst Dep. at 178:10-18; Maerz Dep. at 33:12-16, 35:7-8).

Plaintiff's interview did not go well.  Plaintiff, who had six years of experience in the

PACU at Brandywine, took offense to a question about "what she would bring" to the PACU team.

Plaintiff testified that she found the question "insulting" and felt "agitated," responding, "I can't

believe that you asked me that. . . . How can you ask me about my skills?  You've worked shoulder

to shoulder with me."  (Yingst Dep. at 183:12-188:17).  Though Plaintiff testified that she did not

"yell at anybody or throw things," multiple witnesses present during the interview felt that her

---

[4]       There is no indication that Maerz, who, like Plaintiff, applied for Position 1 after Childs was
purportedly offered the job, was ever interviewed or considered for Position 1.  Rather, much like Plaintiff,
Nurse Maerz, an internal and qualified candidate who applied to Position 1 after it had been offered to
someone else but before it was officially marked as filled, was considered for Position 2.

10

reaction to the question was unprofessional and reflected poorly on her candidacy.   Murphy described the interview as "pretty unsettling for everybody," noting that, although Plaintiff "has a good skill set . . . it did not come across in th[e] interview" and afterward, members of the interview team were "upset, kind of appalled, actually, that someone would act like that in an interview." (Murphy Dep. at 182:2-4, 184:6-24).   Denise Ricken, another member of the interview team, described the interview as "a complete disaster . . . rude, unprofessional, and obnoxious."  (ECF 30-4, Ricken Aff., at ¶ 15).

Murphy testified that Maerz was hired over Plaintiff based on Plaintiff's poor interview performance and, perhaps to some extent, on reports by staff members of past conflicts with Plaintiff.[5]   (Murphy Dep. at 186:22-188:12).   In response, Plaintiff observes that Murphy wrote many positive evaluations of her during Murphy's years as her supervisor, that Maerz did not recall being asked the same questions as Plaintiff in her interview, and that the interviews of Plaintiff and Maerz were delayed and then "rushed at the last minute," and argues that these facts call Defendant's stated reasons for choosing Maerz into question.

Again, Plaintiff's arguments are unpersuasive.   Nothing about the timing or circumstances of the interviews suggests discriminatory animus—Maerz's interview was conducted the same day as Plaintiff's, and Maerz—also a breast cancer survivor—was given even less advance notice than was Plaintiff.   Plaintiff testified that she "had the privilege of having [her] interview conducted in

---

[5]      When asked why she chose Maerz over Plaintiff, Murphy (who earlier testified to an awareness that Plaintiff "did at times have some interpersonal difficulties with some of the staff" (Murphy Dep. at 64:17-19)) replied that "[i]t was just, you know, performance in the interview.   And, you know . . . sometimes [Plaintiff] had that capacity to have that relationship with some of her other staff members." (Murphy Dep. at 188:3-7).   Murphy added that she does not "usually ever go against the staff if their combined opinions were it should be this person, not that person.   Because the PACU's a tight-knit group, you got to work together, and so everyone's decision was Jeanne [Maerz]." (*Id.* at 187:8-13).   When asked whether the interview group ever considered Plaintiff's "potential to be unavailable for work," Murphy replied, "No. That was never a part of it."

a conference room, while [Maerz] had hers in a . . . utility room." (Yingst Dep. at 186:19-21).

Notably, Plaintiff does not offer any evidence to cast doubt on Defendant's assessment of her

interview performance or relationships with colleagues.  On its own, the interview question which

triggered Plaintiff's unprofessional response—whether or not it was also asked of Maerz—even if

intentionally insulting, does not suggest any discriminatory animus related to Plaintiff's disability.

*See Cross v. New Jersey*, 613 F. App'x 182, 186 n.1 (3d Cir. 2015) (rejecting argument that unique

question not asked to other interviewees demonstrated pretext, where question was "a fair question

and [did] not demonstrate that . . . the interviewers demanded more from [plaintiff] during the

interview.").   That Murphy had repeatedly given Plaintiff positive performance reviews is

irrelevant to the pretext argument and analysis here, since Defendant does not cite Plaintiff's long-

term performance as having informed its decision to hire Maerz or its decision not to hire Plaintiff.

*See Martin v. Health Care & Retirement Corp.*, 67 F. App'x 109, 113 (3d Cir. 2003) (holding that

performance review was "not even relevant to our pretext analysis" where employer did not cite

review as reason for  termination); *Swartzentruber v. Bell Atl. Corp.*, 1999 WL 346227, at *7 (E.D.

Pa. June 2, 1999) ("pretext analysis must focus on criteria used by employer as basis for adverse

action; employees performance in other areas . . . is irrelevant" (citing *Simpson v. Kay Jewelers,*

*Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998)).  In light of this evidence, Plaintiff cannot

show that Defendant's stated reasons for hiring Maerz over Plaintiff for Position 2 were pretextual.

Thus, her discrimination claim fails with respect to Position 2.

*Position 3*

Regarding Position 3, Defendant argues that Plaintiff's failure to apply directly for Position

3 (in contrast with the applicant ultimately hired, Michael Sheridan, who submit an application for

Position 3) constitutes a legitimate reason for having hired Sheridan.  In response, Plaintiff argues

12

that failure to apply is not *per se* fatal to a discrimination claim where a plaintiff makes "every reasonable attempt to convey [her] interest in the job to the employer[.]" *EEOC v. Metal Servs. Co.*, 892 F.2d 341, 348 (3d Cir. 1990).  Plaintiff also points to evidence showing that, though both she and Sheridan had expressed interest in full-time employment to Murphy, Murphy only advised Sheridan, and not Plaintiff, that a full-time position had been posted on June 8.  Moreover, Plaintiff observes that HR Manager Criniti actually submitted Sheridan's application for him, but did not submit an application for her.  Again, Plaintiff's arguments fall short.

A review of the record reveals that Plaintiff indicated her interest in full-time positions in the PACU sporadically; Plaintiff identifies only one occasion "in Spring 2015" when she indicated to Murphy that she would be interested in a regular (as opposed to per diem) position, and a handful of text messages "in the late winter / early spring 2016" about her interest in interviewing for a regular position in the PACU.  Moreover, beginning in February 2016, Plaintiff expressed repeated interest to Murphy in nursing positions outside of Brandywine, particularly in Florida.  For example, on February 29, 2016, Plaintiff texted Murphy to advise her that she had used her as a reference for a Florida-based travel nursing agency. A week later, Plaintiff texted Murphy again, having listed her as a reference for another nursing agency in Florida.  This Court agrees with Defendant that Plaintiff's occasional communications of interest in regular employment, coupled with her demonstrated pursuit of outside opportunities, did not constitute "every reasonable attempt to convey her interest" in Position 3, *see EEOC Metal, supra*, particularly in comparison to Sheridan, who proactively sought Murphy's attention and ensured that his application for Position 3 was received despite technical difficulties.  That Murphy advised Sheridan of the position but did not mention it to Plaintiff, under these circumstances, cannot cause a reasonable

13

jury to conclude that Defendant's articulated reasons for hiring Sheridan, and not Plaintiff, were

pretextual.  As such, Plaintiff's discrimination claim fails with respect to Position 3.

*Other Evidence of Discrimination*

In addition to the arguments discussed above, Plaintiff argues that two comments made by

Murphy demonstrate sufficient possible discriminatory bias to call into question Defendant's

stated reasons for its hiring decisions.  The first of these comments is Murphy's statement in the

May 3, 2016 staffing memorandum that "Laura Yingst is one of the 4 staff left and has had 4

surgeries over the past year and been out a good amount of time."  The second is Murphy's

purported remark, when Plaintiff confronted Murphy about seeing Sheridan on the schedule full-

time, that it was because Plaintiff had "missed too much time."  Though Plaintiff believed that

Murphy's comments demonstrated animus related to her cancer diagnosis, the context surrounding

these statements suggests otherwise.  Murphy's memorandum was drafted for the purpose of

obtaining approval for additional PACU positions (further, Plaintiff does not dispute the veracity

of Murphy's comment).  In contrast, Murphy's June comment was made at the time between

Plaintiff's application for Position 1 and her interview for Position 2; during that time, according

to Plaintiff, "Murphy and Ms. Besack were discussing [Plaintiff's] eligibility for a transfer," which

included a standard review of her employee file.  Notably, the records of Plaintiff's absences that

Besack shared with Murphy only included absences and related disciplinary action that predated

Plaintiff's cancer diagnosis.  Though Besack's e-mail to Murphy hinted at a potential follow-up

discussion related to Plaintiff's later absences, the record contains no evidence of any such further

discussion.  As such, Plaintiff identifies no meaningful link between Murphy's remarks about her

"missed time" and Defendant's attitude toward Plaintiff's cancer diagnosis.  From this record,

Plaintiff cannot show that it is more likely than not that discrimination related to her illness

14

motivated Murphy's hiring decisions, rather than the legitimate reasons articulated.  *See Munoz v. Nutrisystem, Inc.*, 2014 WL 3765498, at \*6 (E.D. Pa. July 30, 2014) (granting summary judgment to employer where plaintiff presented no evidence to discredit explanation that plaintiff was fired because of attendance record, rather than her disability, even though some absences were disability-related); *see also Kazmierski v. Bonafide Safe & Lock, Inc.*, 223 F. Supp. 3d 838, 846 (E.D. Wis. 2016) (granting summary judgment to employer where "all of the evidence makes clear that it was the absences themselves, rather than the reasons for them, that prompted the plaintiff's termination."); *Punt v. Kelly Servs.*, 2016 WL 67654, at \*11 (D. Colo. Jan. 6, 2016) (rejecting breast-cancer-survivor plaintiff's arguments in ADA termination case that employer comments about her availability/reliability demonstrated pretext, since purported comments were "not sufficient to render [employer's] rationale for her termination 'unworthy of belief,' especially when compared with the . . . undisputed record of her absences"); *Charnley v. Boeing Co.*, 2009 WL 279030, at \*6 (W.D. Wash. Feb. 5, 2009) (granting summary judgment to employer where employer's review of plaintiff's absences contained no obvious link to any injury).

Since Defendant has articulated legitimate, nondiscriminatory reasons for each of its hiring decisions, and Plaintiff has not presented evidence sufficient to satisfy her burden at the third stage of the *McDonnell Douglas* analysis that such reasons are pretextual, her discrimination claims fail as a matter of law.  Therefore, summary judgment is granted in favor fo Defendant on Plaintiff's discrimination claims.

### *Retaliation*

Plaintiff also claims that Defendant retaliated against her for complaining to HR about her unfair treatment in the hiring process.  To prove retaliation under the ADA and PHRA, "an employee must show 1) she engaged in a protected activity; 2) the employer took adverse action;

15

and 3) a causal connection." *Castellani v. Bucks Cty. Municipality*, 351 F. App'x 774, 777 (3d Cir. 2009) (citing *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 567-68 (3d Cir. 2002)).  If an employee establishes a *prima facie* case of retaliation, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for failing to hire the employee; if the employer meets that burden, the burden shifts back to the employee to show that the stated reason was a pretext for retaliation.  *See White v. Purolite Corp.*, 2020 WL 1875632, at *7 (E.D. Pa. Apr. 15, 2020) ("The same *McDonnell Douglas* burden shifting standard . . . applies in the ADA discrimination and retaliation context."  (citing *Deane v. Pocono Med. Ctr.*, 143 F.3d 138, 142 (3d Cir. 1998))).

Defendant concedes that Plaintiff's complaints to HR about discrimination constitute a protected activity, but argues that Plaintiff cannot establish a causal connection between those complaints and Murphy's failure to hire Plaintiff, as there is no evidence in the record that Murphy, or any member of the interview team, ever learned that Plaintiff had complained of discrimination. Plaintiff argues that Criniti's assurance to Plaintiff that she would pass Plaintiff's complaints on to Besack, coupled with the fact that Besack and Murphy corresponded at least once about Plaintiff's eligibility for transfer, create a dispute of material fact as to whether Murphy knew Plaintiff had complained of discrimination.  Even assuming, *arguendo*, that this scant evidence of Murphy's awareness is sufficient to establish a *prima facie* case of retaliation here, it does not change the fact that Defendant has presented credible nondiscriminatory reasons for its hiring choices.  As Plaintiff has presented no direct evidence of retaliation, and no evidence of pretext beyond the proffered reasons listed above, all of which have been found incapable of leading a jury to "disbelieve the employer's articulated legitimate reasons," *Gardner*, 636 F. App'x at 86, her retaliation claims fail as a matter of law.  Consequently, summary judgment is granted with respect to those claims.

**CONCLUSION**

For the forgoing reasons, Defendant's motion for summary judgment is granted. Accordingly, judgment on all claims is entered in favor of Defendant.  An Order consistent with this Memorandum Opinion follows.


*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C.J.